1
2
3
4
5
6                    **UNITED STATES DISTRICT COURT**

7                         **DISTRICT OF NEVADA**

8                                   * * *

9                                                Case No. 2:15-cv-00833-RFB-PAL

10   THE ESTATE OF MARILYN
     BURGARD, et al.,                            **ORDER**

11
                     Plaintiffs,
12
13           v.

14   BANK OF AMERICA, N.A. et al.,

15                   Defendants.

16
     **I.      INTRODUCTION**
17
18           Before the Court are Defendants Bank of America ("BANA") and Aetna Life Insurance's

19   ("Aetna") Motion for Summary Judgment, ECF No. 47, Plaintiffs' Objection to Discovery Order,

20   ECF No. 53, and Plaintiffs' Motion for Leave to File Supplement. ECF No. 62. For the reasons

21   stated below, ECF No. 47 Motion for Summary Judgment is granted in part and denied in part;

22   ECF no. 53 Objections to Discovery Order is denied, and ECF No. 62 Motion for Leave to File

23   Supplement is granted.

24   **II.     BACKGROUND**

25           On May 4, 2015, Defendant removed this action from the Eighth Judicial District Court.

26   ECF No. 1. On May 11, 2015, Defendant filed a motion to dismiss for failure to state a claim. ECF

27   No. 4. On February 17, 2015, this Court denied Defendants motions to dismiss as to claims 1, 2,

28   3; but granted it as to claims 4 and 5 without prejudice. ECF No. 25. The Court denied without

prejudice as to state law claims and granted without prejudice as to Plaintiff's claim for punitive and exemplary damages. On March 15, 2015, Plaintiff filed a second amended complaint. ECF No. 28. The Second Amended Complaint asserts four counts: (1) Breach of Contact, (2) Breach of the Implied Covenant of Good Faith and Fair Dealing, (3) Violation of the Nevada Unfair Practices Act (NRS 686A.310), and (4) ERISA (29 USC § 1132 and § 502(a)).

A scheduling order was entered on March 28, 2016, which provided a discovery cutoff date of August 23, 2016. ECF No. 31. The order stated the following as to dispositive motions: "Filing Date for Dispositive Motions: Thirty (30) days after the close of discovery, which is September 22, 2016; However, the Court previously ruled that Defendants can file and the Court will consider an earlier summary judgment motion regarding whether ERISA is applicable to this case (see ECF 25)."

On August 4, 2016, Defendants filed a Motion for a Protective order. ECF No. 39. Plaintiff did not conduct written discovery. The Motion sought to limit deposition testimony of various individuals allegedly possessing knowledge as to Burgard's life insurance policy. On August 26, 2016, Defendant filed a motion for summary judgment. ECF No. 47. On September 9, 2016, Judge Foley granted the Motion for a Protective Order in part and denied in part, permitting one 30(b)(6) deposition of a representative of BANA who "should be prepared to testify about relevant information or documents in the possession of both BANA and Aetna." The order permitted testimony to cover (1) "the fate of the life insurance policy provided to Ms. Burgard at the time of her retirement in 1986, (2) what records may exist pertaining to cancellation of life insurance policies provided to retired employees by predecessor employers or plans; (3) the process by which retired employees were able to convert to life insurance policies in which they pay premiums; and (4) what records may still exist regarding the termination of Burgard's plan and if she was afforded an opportunity to continue life insurance coverage. On September 23, 2016, Plaintiff filed Objections to Judge Foley's order. ECF No. 53. On December 13, 2016, Defendants filed a Motion for Leave to File a Supplement to ECF No. 47 MSJ. The supplement incorporates the testimony permitted by Judge Foley in the order on September 9, 2016, after the original Motion for Summary Judgment had been filed.

1  **III.    MOTION FOR LEAVE TO FILE SUPPLEMENT. ECF NO. 63.**

2       A scheduling order was entered on March 28, 2016, which provided a discovery cutoff date

3  of August 23, 2016. ECF No. 31. The order stated the following as to dispositive motions: "Filing

4  Date for Dispositive Motions: Thirty (30) days after the close of discovery, which is September

5  22, 2016; However, the Court previously ruled that Defendants can file and the Court will consider

6  an earlier summary judgment motion regarding whether ERISA is applicable to this case. On

7  August 4, 2016, Defendants filed a Motion for a Protective order. ECF No. 39. The Defendants

8  filed their Motion for Summary Judgment on August 26, 2016. ECF No. 47.

9       Subsequent to that filing, the parties litigated the Motion for a Protective Order, and Judge

10  Foley narrowed the scope of discovery in his order issued September 9, 2016. The deposition

11  permitted in that order, of Patricia Parker, BANA's Global Human Resources Services Delivery

12  Manager and 30(b)(6) corporate designee, occurred on November 16, 2016. To prepare for the

13  deposition testimony, Parker "researched available historical databases and reached out to prior

14  vendors to ensure that she could fully and completely testify as to the deposition topics." The

15  Defendants filed the Motion for Leave to File the Supplement on December 13, 2016. ECF No.

16  62.  After extensions of time were granted, Plaintiff Responded to both the Motion for Summary

17  Judgment and the Supplement on February 2, 2017. ECF No. 70.

18       The record shows that Plaintiff filed an early Motion for Summary Judgment, as

19  specifically suggested by the Court, while they were litigating a discovery dispute. Pursuant to the

20  decision on that dispute, additional discovery occurred in the form of the deposition of Parker.

21  Plaintiffs were permitted ample time to Respond to the Motion for Summary Judgment and the

22  Supplement. Therefore, the Motion reflects good-faith compliance with the orders and

23  recommendations of the magistrate and the Court, and did not prejudice the Plaintiff. ECF No. 62

24  Motion for Leave to File is GRANTED, and the Court considers this motion in conjunction with

25  the Motion for Summary judgment.

26  **IV.    LEGAL STANDARD**

27      **A. Motion for Summary Judgment**

28       Summary judgment is appropriate when the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When considering the propriety of summary judgment, the court views all facts and draws all inferences in the light most favorable to the nonmoving party. Gonzalez v. City of Anaheim, 747 F.3d 789, 793 (9th Cir. 2014). If the movant has carried its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Scott v. Harris, 550 U.S. 372, 380 (2007) (alteration in original) (internal quotation marks omitted).

## V.    UNDISPUTED FACTS

### A.  The "Fate" of Burgard's Life Insurance Plan

The Court finds the following facts to be undisputed: On or about April 7, 2012, Marilyn Burgard was killed in a car accident. In 1986, Ms. Burgard received a $10,000 life insurance benefit from her employer Arizona Bank at the time of her retirement. Patricia Parker discovered 1990 and 1992 benefit enrollment records which confirm that Ms. Burgard had life insurance coverage during this time period through Security Pacific. The enrollment records from 1990 and 1992 preceded Bank of America and Aetna's administration of Ms. Burgard's benefits. The 1990 document identified by Ms. Parker as the "original enrollment" showed enrolled benefits for Ms. Burgard, including medical coverage, dental coverage, retiree life insurance, accidental death, and benefit dollars. The critical information in this document establishes that in 1990 Ms. Burgard had $10,000 in life insurance coverage, with a premium of $10.90.

Arizona Bank was acquired by Security Bank around the time of Burgard's retirement and she was subsequently treated as a Security Bank retiree. Security Bank was then acquired by Bank of America. Prior to Aetna and Bank of America becoming partners in January 1, 2009, there were other carriers offering insurance coverage to retirees. In 2009, several years after BANA's acquisition of Security Bank, BANA partnered with Aetna, and its Retiree Life Insurance Plan

became effective. The Summary Plan Description ("SPD") states that "participants and beneficiaries have no vested rights in the BANA Group Benefits Program, any retiree component plan or any program or policy; in particular, no vested rights arise in benefits currently made available to retirees after employment ends or to current contributions required to be paid by retirees."

The benefit enrollment offered by Security Pacific provided options for waiving life insurance coverage in exchange for benefit dollars. For example, Ms. Burgard received $196.52 per month in Benefit Dollars, $185.62 for "medical dollars" to be used toward her medical benefit, and $10.90 of "life dollars" related to her life insurance benefit. If she waived these benefits, these amounts would go into her Health Care Savings Fund. Burgard continued her medical and dental coverage, waived vision coverage, and maintained life insurance benefits in the amount of $10,000, with a premium of $10.90, and a separate AD&D [Accidental Death and Dismemberment] policy of $10,000.

Historical records provided by Security Pacific BANA included a Security Pacific newsletter, "The Benefits Newsletter for Retirees" where an article was issued in October 1992, "What's New for 1993." The article described how retirees could lower or waive their life insurance coverage and apply those benefits to other covered premiums. Once the insured lowered or waived their coverage, the lower coverage would then become the maximum available to them, and once waived the insured could not re-enroll in that benefit. The article further addressed the healthcare savings fund and the use of "Benefit Dollars." "Benefit Dollars" were payments made by the former employer and were provided to the retirees to purchase life insurance. The article explained, "if you choose coverage lower than you have currently, the excess Benefit Dollars can be used to pay for Dental or Vision coverage, or they can be deposited into your Health Care Savings Fund." The Health Care Savings Fund is used by the retirees to pay eligible health care expenses not covered by the retirees' medical plans or Medicare. After 1992 there are no records establishing that Ms. Burgard continued to elect life insurance coverage of $10,000, with a premium of $10.90. The records do identify Ms. Burgard applying her "Benefit Dollars" to her HCSF contribution. There is a gap from 1992 to 2001 for which Defendants have no records related

1   to Ms. Burgard.

2       In 1998, Bank of America issued its Plan documents for Retirees where it specifically
3   stated that when a retiree waived his or her life insurance, then it was a permanent election. While
4   some records are missing, BANA did find benefit records for Ms. Burgard between August 2001
5   and December 2013. From 2001 to 2003 the third party administrator for Bank of America was
6   AON Hewett ("AON"). Aetna did not become the insurer of Bank of America until 2009. The
7   records from AON identify the Plan's identification codes that are set forth in the benefit
8   spreadsheet. The critical codes are the Inactive Plan Codes which are designated for retirees. The
9   critical codes are "7900" (Retiree Life Insurance – West), "7050" (Health Care Saving Fund),
10  "2000" (Retiree Medical), "3050" (Retiree Dental), and "3450" (AD&D). AON's records do not
11  show that Ms. Burgard had a life insurance coverage benefit on August 1, 2001. They do show
12  that she was receiving "Flex/Benefit Dollars" that were being paid into her Health Care Saving
13  Account in the amount of $130.80. Defendants found no records of Ms. Burgard having life
14  insurance coverage after 2001.

15      Fidelity was the third party administrator for Bank of America's Plan from 2006 to June
16  30, 2011. Ms. Parker retrieved from Fidelity a spreadsheet reflecting Ms. Burgard's benefits during
17  this time period. Based on her experience and her review of thousands of these records over a
18  course of years, Ms. Parker stated her professional opinion that this historical data undeniably
19  established that Ms. Burgard had no life insurance benefits and was receiving flex dollars in lieu
20  of coverage. Data Ms. Parker received from Benefit Solutions, the third-party administrator for the
21  health care saving fund ("HCSF") account for Bank of America retirees including Ms. Burgard,
22  confirm that monthly benefit/flex dollars were being paid into her HCSF.

23      On December 11, 2010, Burgard completed and signed a Beneficiary Designation Form
24  where she indicated that the beneficiary designation applied to all plans she was currently enrolled
25  in, and from a list of benefits, she checked only the AD&D coverage benefit, leaving the Retiree
26  Life Insurance un-marked. In 2011, at the end of the year, Ms. Burgard completed her 2012 Annual
27  Enrollment Worksheet. The Worksheet specifically stated that if she did not make any changes to
28  her benefit enrollment then she would continue to maintain the benefits she had in 2011 which

- 6 -

included medical dental, AD&D, and a Health Care Savings Fund, where she was receiving a monthly credit of $314.66. On August 27, 2012 (after Burgard's death in April of that year), and after the AD&D benefit was paid on July 27, 2012, Plaintiff received a letter on BANA letterhead from a "Jasmine." The letter stated that "Marilyn is covered under the Retiree Life Insurance Plan" (ECF No. 50 at 12) (ECF No. 70 at pdf p. 152). The letter designates Jasmine as Bank of America Global Human Resources Service Center Survivor Support Specialist. The letter includes a "summary of benefits section" with a subsection "Retiree Life Insurance Plan." That subsection does not describe the plan but merely states that she is covered under a "Retiree Life Insurance Plan" and that no beneficiary is on file for the plan. There is also a subsection "Retirement Benefits" that references 401(k)s. On April 26, 2012, Plaintiff received a letter that states that he is the named beneficiary for a "Retiree Life Insurance Plan" and that "the estimated life insurance amount is $10,000." The letter mirrors the letter sent by "Jasmine" and does not clearly describe what the life insurance plan is, or if it distinct from the undisputed and paid accidental death coverage.

**B.  The Terms of Burgard's Purported Plan at the Time of Death**

The Bank of America Retiree Health and Insurance Summary Plan Description 2011 (SPD), which went into effect July 1, 2011, and was in effect at the time of Ms. Burgard's death in April 2012, summarizes the Plan's terms. The SPD states that the Plan, "applies to retirees, including retirees from certain predecessor companies." The SPD lists "ERISA-covered retiree component plans," which include the following types of benefits: medical, health care accounts, dental, vision, and life insurance." The SPD states that its provisions, "are not guaranteed; they are subject to change at any time without notice and are subject to Bank of America's discretion in their application." The SPD further provides that Bank of America, "has the exclusive right to amend, suspend or terminate any benefit plan or any other program or policy described in this summary." It further provides that BANA has discretion in its application and interpretation of provisions.

As part of the Plan, "Bank of America offers group term life insurance to certain retirees." The Plan was designed, drafted, and prepared exclusively for Bank of America, and went into

effect on January 1, 2009. The SPD contains two booklets that describe the life insurance coverage available for retirees of Security Pacific: Booklet 3 as to supplemental accidental death and personal loss insurance; and Booklet 5 as to supplemental life insurance. Depending on the type of life insurance benefit for which the participant is eligible, contributions (i.e., premiums) are paid by Bank of America and/or the retiree participant. "Security Pacific retirees who retired before Jan. 1, 1991 and had attained age 55 with at least 5 years of benefit service as of Dec. 31, 1992 or had attained age 60 with at least 1 year of service as of Dec, 31, 1992 receive a bank subsidy that is adjusted based on the current cost of a specific grandfathered plan that was offered to Security Pacific employees." Booklet 3 of the SPD provides that Bank of America is the source of contributions (i.e., pays the premiums) for this accidental death and personal loss insurance. Booklet 5 of the SPD provides that the participant retiree is the source of contributions for this supplemental life insurance.

"The Plan Administrator is the Bank of America Corporation Corporate Benefits Committee, which is appointed by the Compensation and Benefits Committee of the Board of Directors of Bank of America Corporation. As Plan Administrator, the committee is responsible for overall administration of the Group Benefits Program and each retiree component plan." Among other duties as Plan Administrator, Bank of America is responsible for complying with the ERISA reporting rules and regulations. As Policyholder, Bank of America selects the products and benefit levels under the Plan. Booklets 3 and 5 both advise the participants that if they have any questions regarding their Plan, they should contact the Plan Administrator, which is Bank of America

The SPD states that it "contains the summary plan descriptions of available benefit plans covered by The "ERISA information" chapter is part of "the summary plan description for the Bank of America Retiree Life Insurance Plan." The "ERISA information" chapter explains that some of the benefits in the SPD are retiree component plans under the Bank of America Group Benefits Program ("Group Benefits Program") and are subject to [ERISA], and that these ERISA plans are identified in the table under "ERISA-covered retiree component plans" at the end of the chapter. "Life Insurance" is identified as one of the ERISA plans in the table. Bank of America is

- 8 -

incentivized to offer the life insurance coverages, including the voluntary coverages funded by the participants, as part of a bundled Group Policy by discounted pricing on the premiums it pays for the employer-funded coverages.

Defendants have no record of Ms. Burgard having supplemental life insurance coverage through the Plan. Stephanie Skowron, Aetna's Senior Life Claims Analyst affirmed that she was responsible for handling and processing the accidental death and personal loss claim related to Ms. Burgard, but that there was no supplemental life insurance under the Plan on record for Ms. Burgard. On October 23, and November 8, 2012, Skowron responded to correspondence from Kevin Horan explaining the only benefits documented in the database that were related to Ms. Burgard were the accidental death and personal loss benefits that had already been paid out, and there were no additional benefits associated with this claim. The database as it pertains to Ms. Burgard does not document eligibility for the supplemental life insurance coverage described in Booklet 5 which is recorded in the Claim Status Note. The Claim Status Note identifies all benefits, policies, and action related to Ms. Burgard as a participant. For Ms. Burgard, the only coverage the Claim Status Note references is the supplemental accidental and personal loss coverage described in Booklet 3.

In addition, Ms. Drake affirms that if Aetna had received confirmation of eligibility for supplemental life insurance coverage from Bank of America and/or its third party administrator, the life claims analyst would have to still confirm that there was coverage in force by checking the in-house retiree listing. Ms. Drake reviewed the retiree list and Ms. Burgard was not listed as an eligible retiree under the supplemental life insurance benefits, but was listed as an eligible retiree for accidental death and personal loss benefits. Ms. Drake further reviewed the records and confirmed that Aetna did not have any records of premiums ever being paid on Ms. Burgard's behalf for a supplemental life insurance policy, which is a retiree contribution policy. Bank of America and its third party administrator, also reported to Ms. Drake in May 2016, that they reviewed their records and found no records of premiums ever being paid on Ms. Burgard's behalf for the supplemental life insurance policy. It is undisputed that on July 27, 2012, Aetna paid Plaintiff a $10,000 Accidental Death Benefit, plus $7.86 in interest, and on August 16, 2012, Aetna

paid Plaintiff a $10,000 Seatbelt Benefit, plus $9.08 in interest. Both benefits were covered under the accidental death and personal loss coverage.

## VI.  DISCUSSION

Defendants argue that any plan inherited from Arizona Bank and Security Pacific, for which they could be liable, would fall within the terms of the SPD, and constitute an ERISA Plan. Defendants further argue that the Safe Harbor provision does not apply and that all state law claims are pre-empted by ERISA. Finally, Defendants contend that they have conclusively shown that if Ms. Burgard ever had a plan, it was waived or abandoned, and therefore Plaintiffs' ERISA claim must fail. Plaintiffs argue that even if the plan was originally an ERISA plan, it could have been converted to an individual plan over time. Plaintiffs further argue that it is undisputed that Plaintiff had a plan upon her retirement, and there remains a dispute as to the "fate" of the plan. For the reasons stated below, the Court concludes that any plan for which Defendants would be liable would be an ERISA plan, to which the Safe Harbor does not apply; that all of the state law claims are preempted; and that there remains a dispute of material fact as to the "fate" of the plan and whether Ms. Burgard was entitled to the benefit upon her death.

### A.  ERISA Pre-Emption

#### i.  Safe Harbor

ERISA's safe harbor provision provides that benefit plans are not considered employee welfare plans or welfare plans under ERISA when: the employer or employee organization makes no contributions; participation in program is completely voluntary for employees or members; the employer does not endorse the program but merely allows the insurer to publicize the program to employees and collects premiums to remit to the insurer; and when the employer or employee organization does not receive any consideration other than reasonable compensation, excluding any profit, for administrative services actually rendered to collect and remit premiums to the insurer. 29 C.F.R. § 2510.3-1 (j).  "An employer has not established an ERISA plan if it merely advertises a group insurance plan that has none of the attributes described in 29 C.F.R. § 2510.3–

1(j)." Kanne v. Conn. Gen. Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988). To invoke the safe harbor exemption, all four requirements must be satisfied. Stuart v. UNUM Life Ins. Co. of America, 217 F.3d 1145, 1153 (9th Cir. 2000).

The third element bars application of the safe harbor where the employer "actively endorses" a plan, encouraging employees to join, or serves as the administrator of the plan. Sarraf v. Standard Ins. Co., 102 F.3d 991, 993 (9th Cir. 1996). Defendants argue that BANA established and maintained its Plan, and the Plan documents describe the Plan as an ERISA-governed plan: "Bank of America acts as more than just a conduit for the life insurance; it endorses the Plan in its role as Plan Administrator by: preparing and drafting the SPD; determining the benefits to be provided; describing the Plan as an ERISA-governed Plan; retaining discretion to interpret the Plan documents and to amend or discontinue the Plan; providing information to the Plan participants in relation to the Plan; and its duty to comply with ERISA's reporting requirements."

The Court finds that the original Arizona plan was eventually acquired by BANA. It was thus a supplemental life insurance plan as described in Booklet 5 of the SPD, placing it within a plan administered by BANA, over which BANA has declared its control and ability to amend and rescind, as well as its intention for ERISA to apply. BANA has represented that it does not administer or have any involvement in any individual plans of any other kind regarding life insurance.  Moreover, even if the Plaintiff's original Arizona plan coverage was somehow converted to an individual plan or a different provider, BANA and AETNA have no record of the plan and would then not be proper defendants for the state law claims, or an ERISA claim. Defendant does not contest that the SPD refers to the relevant life insurance plan, and place it within the Retiree Life Insurance Plan framework. The Court finds that framework makes clear administration by BANA, and therefore endorsement that bars application of the safe harbor to Plaintiff's claims.

**ii.  ERISA Plan**

A defendant bears the burden of proving the necessary facts to establish ERISA preemption as a defense. Kanne v. Connecticut Gen. Life Ins. Co., 867 F.2d 489, 492 (9th Cir. 1988). Whether an ERISA plan existed is a question of fact "to be answered in the light of all the surrounding

circumstances from the point of view of a reasonable person." <u>Zavora v. Paul Revere Life Ins. Co.</u>, 145 F.3d 1118, 1120 (9th Cir. 1998). In reviewing the surrounding circumstances, a judge may consider documents not physically attached to the complaint if the "authenticity ... is not contested" and "the plaintiff's complaint necessarily relies" on them. <u>Lee v. City of Los Angeles</u>, 250 F.3d 668, 688 (9th Cir. 2001) (overruled on other grounds). An ERISA plan is: (1) A plan, fund or program, (2) established or maintained by an employer or by an employee organization, or by both, (4) for the purpose of providing medical, surgical, hospital care, sickness, accident, disability, death, or unemployment benefits to the participants or their beneficiaries. 29 U.S.C. § 1002(1).

An employer cannot establish a plan by merely deciding to extend benefits; A plan is established when the benefits are offered under an organized scheme and the terms allow a reasonable person to determine the basic elements of the scheme. <u>Winterrowd v. Am. Gen. Annuity Ins. Co.</u>, 321 F.3d 933, 939 (9th Cir. 2003). Very few offers to extend benefits fail to establish a plan. <u>Id.</u> A participant is an employee or former employee that is or may become eligible for benefits under the employer's benefit plan or whose beneficiaries may be eligible to receive any such benefits. 29 U.S.C. § 1002 (2)(B)(7).

ERISA preempts state laws under two provisions: 29 U.S.C § 1144(a) and 29 U.S.C. § 1132(a). <u>Cleghorn v. Blue Shield of California</u>, 408 F.3d 1222, 1225 (9th Cir. 2005).

Conflict preemption occurs under 29 U.S.C. 1132(a)—commonly known as §502(a). <u>Fossen v. Blue Cross and Blue Shield of Montana, Inc.</u>, 660 F.3d 1102, 1107 (9th Cir. 2011). Conflict preemption under §502(a) completely preempts state-law claims within the scope of ERISA's civil enforcement provisions. <u>Aetna Health Inc. v. Davila</u>, 542 U.S. 200, 209 (2004). State-law claims are completely preempted if: (a) an individual could have brought the claim under ERISA §502(a) at some point in time, and, (b) there is no other independent legal duty that is implicated by the defendants' actions. <u>Davila</u>, 542 U.S. at 210. Section 502 allows claims to be brought when the participant or beneficiary seeks to: (a) recover benefits due under the ERISA plan, (b) enforce rights under the ERISA plan, or (c) clarify rights to future benefits under the ERISA plan. 29 U.S.C. § 1132(a)(1)(B). Section 502 also allows claims to be brought when the

1    participant or beneficiary seeks relief from an ERISA plan fiduciary who breached any

2    responsibilities, obligations, or duties imposed upon fiduciaries. 29 U.S.C. § 1109.

3         Express preemption occurs under 29 U.S.C. 1144(a)—commonly known as Section 514(a).

4    Fossen, 550 F.3d at 1107. Preemption under Section 514 is broad in scope and deliberately

5    expansive. Pilot Life Ins. Co. v. Dedeux, 481 U.S. 41, 46 (1987). Section 514 expressly preempts

6    any state laws that relate to employee benefit plans. Id. at 45 (1987). "Relate to" is defined broadly

7    with a common–sense meaning; "a state law 'relates to' a benefit plan 'if it has a connection with

8    or reference to such a plan." Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724, 732

9    (1985). ERISA may preempt a state law if it relates to an employee benefit plan even if the law is

10   not specifically designed to affect such plans or the effect is only indirect. Bast v. Prudential Ins.

11   Co. of Am., 150 F.3d 1003, 1007 (9th Cir. 1998). A state law "relates to" an ERISA plan if it has

12   a connection with or reference to such a plan. California Div. of Labor Standards Enforcement v.

13   Dillingham Const., N.A., Inc., 519 U.S. 316, 324 (1997).

14       Courts use a "relationship test" to determine whether a claim has a 'connection with' an

15   employee benefit plan; "this test emphasizes 'the genuine impact that the action has on a

16   relationship governed by ERISA, such as the relationship between the plan and the participant.'"

17   Providence Health Plan v. McDowell, 385 F.3d 1168, 1171-72 (9th Cir. 2004). "Connection to" is

18   determined by analyzing the following factors: (a) whether the state law regulates the types of

19   benefits of ERISA employee welfare plans, (b) whether the state law requires the establishment of

20   a separate employee benefit plan to comply with the law; (c) whether the state law imposes

21   reporting, disclosure, funding, or vesting requirements for ERISA plans; and (d) whether the state

22   law regulates certain ERISA relationships, including the relationships between an ERISA plan and

23   employer and, to the extent an employee benefit plan is involved, between the employer and

24   employee. Operating Engineers Health & Welfare Trust Fund v. JWJ Contracting Co., 135 F.3d

25   671 (9th Cir. 1998). A state law "references an ERISA plan when it 'acts immediately and

26   exclusively upon ERISA plans' or 'where the existence of ERISA plans is essential to the law's

27   operation." California Div. of Labor Standards Enforcement v. Dillingham Const., N.A., Inc., 519

28   U.S. 316, 323 (1997).

1    However, ERISA's saving clause may exempt state laws from §514 preemption. 29 U.S.C.

2    § 1144. The savings clause provides that ERISA must not be construed to exempt or relieve any

3    person from any state law that regulates insurance, banking, or securities. 29 U.S.C. § 1144

4    (b)(2)(A). Employee benefit plans and trusts established under such plans cannot be deemed to be

5    an insurance company or in the business of insurance. 29 U.S.C. § 1144(b)(2)(B).  This is known

6    as the deemer clause, which regulates state laws that 'purport to regulate insurance.' See Pilot Life

7    Ins. Co. 481 U.S. at 45. It prevents exemption from preemption. But a plan established primarily

8    for the purpose of providing death benefits may be deemed an insurance company or part of the

9    insurance industry. 29 U.S.C. § 1144 (b)(2)(B).

10    A state law regulates insurance under the savings clause if: the state law is specifically

11    directed toward the insurance industry; and, the state law substantially affects the risk pooling

12    arrangement between the insurer and the insured. Kentucky Ass'n of Health Plans, Inc. v. Miller,

13    538 U.S. 329, 342 (2003). State laws of general application that have some bearing on insurers do

14    not fall under the savings clause exemption. Kentucky Ass'n of Health Plans, Inc. v. Miller, 538

15    U.S. 329, 334 (2003).

16    Plaintiff does not address arguments to the specific question of whether or not the life

17    insurance coverage falls within an ERISA plan. Defendants argue that the SPDs lay out the death

18    benefits provided, and place them within a framework clearly maintained and administered by

19    BANA. A plan is maintained where an employer administers the plan. Sarrf v. Standard Ins. Co.,

20    102 F.3d 991, 993 ("As the plan administrator, OCEA also maintained the plan.") "Nonetheless,

21    we concluded that the plan was an employee welfare benefit plan subject to ERISA because the

22    employer, as the plan administrator, endorsed the group insurance plan within the meaning of the

23    third requirement of the safe harbor regulation. We stated that because the employer is more than

24    a mere advertiser of group insurance, there need not be employer contributions or automatic

25    employee coverage to bring the plan within ERISA." Stuart v. UNUM Life Ins. Co. of America,

26    217 F.3d 1145, 1150 (9th Cir. 2000). Having determined that the Plan is not exempt under the safe

27    harbor because it is administered and therefore endorsed by the employer, the Plan also satisfies

28    the "maintained" requirement to fall within the ERISA definition of a covered plan.

### iii.  Breach of Contract Claim

As the Court found at the hearing on the Motion to Dismiss, if the plan is an ERISA plan, this claim is preempted.   The Court now finds the Plan to be an ERISA plan. The Court incorporates by reference its findings as to that Motion, and elaborates. This claim falls within section 502(a) because section 502(a) allows Horan to seek recovery for benefits due under the ERISA plan and enforce the rights established under the ERISA plan. Aetna and Bank of America's duty to provide the benefits stems solely from the ERISA plan, rather than an independent legal duty. Moreover, it is well established that breach of contract claims—whether contractual or tortious—fall within section 502(a). *See* <u>Aetna v. Davila</u>, 542 U.S. at 215. This claims is thus preempted.

### iv.  Breach of Implied Covenant

Plaintiffs argue that an implied covenant and duty of good faith exists in every insurance contract in Nevada, and that Aetna and Bank of America breached this duty by failing to respond to the Horan's twelve requests. Section 502 allows Plaintiffs to bring a claim to clarify the rights under the Plan and recover the benefits due to Burgard's estate under the Plan. Horan's twelve correspondences sought to do exactly that. Moreover, this claim is also dependent upon the legal duties established by the ERISA plan. Therefore, this claim is also preempted by section 502(a).

### v.  Violations of Nevada Unfair Practices Act (NRS 686A.310)

Plaintiffs allege Aetna and Bank of America violated NRS 686A.310 by failing to provide benefits upon Ms. Burgard's death and failing to respond to Horan's communications.  They also argue that the claim is exempt from ERISA preemption under the savings clause.

The Nevada Supreme Court has already analyzed the relationship between Nevada's Unfair Practice Act and ERISA. According to the Nevada Supreme Court's interpretation of the state law, the claim is preempted under section 514. In <u>Villescas v. CNA Ins. Companies</u>, the Nevada Supreme Court held that claims under Nevada's Unfair Practices Act conflict with ERISA and are preempted when applied to a valid ERISA plan. 864 P.2d 288, 294 (Nev. 1993). The court held the provisions of NRS 686A.310 do not pool or average policyholder's risks; the provisions instead "force the insurer to bear the legal risks associated with certain unfair insurance practices, such as

1  misrepresentation." Id. at 1082. Accordingly, the state law does not substantially affect the risk

2  pooling arrangement between the insurer and insured. Therefore, the savings clause does not

3  exempt the claim from ERISA preemption.

4      Therefore, the Court finds that if there is a plan under which these Defendants could be

5  liable, the plan is an ERISA plan, and all of the state law claims are preempted. There remains

6  only the claim for an ERISA violation.

7

8          **B.  The ERISA claim**

9      Plaintiff's fourth claim for relief asserts a violation of ERISA "pursuant to 29 USC § 1132

10  and § 502(a)."

11      ERISA section 502(a) allows a Plaintiff to seek recovery for benefits due under the ERISA

12  plan and enforce the rights established under the ERISA plan. "Extracontractual, compensatory

13  and punitive damages are not available under ERISA." Bast v. Prudential Ins. Co. of America, 150

14  F.3d 1003, 1009 (9th Cir. 1998). "As concluded by other circuit courts which have addressed the

15  question, when the court reviews a plan administrator's decision under the de novo standard of

16  review, the burden of proof is placed on the claimant." Muniz v. Amec Const. Management Inc.,

17  623 F.3d 1290, 1294 (9th Cir. 2010) (citing cases finding that plaintiff bears burden of establishing

18  entitlement to contractual benefits under 29 USC 1132(a)(1)(B))

19      "In actions challenging denials of benefits based on interpretations pursuant to section

20  1132(a)(1)(B), the district court reviews de novo, "unless the benefit plan gives the administrator

21  or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of

22  the plan." Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan, 46 F.3d 938, 942 (9th

23  Cir. 1995). In Mongeluzo, the Ninth Circuit held that when conducting de novo review of a benefits

24  decision, "new evidence [beyond the administrative record] may be considered under certain

25  circumstances to enable the full exercise of informed and independent judgment." Id. at 943-44.

26  The Court found that additional evidence as to whether an alleged disability fell within a narrow

27  definition of "mental illness" established by a prior decision should be permitted under that

28  standard. Id. at 944.

Under the undisputed facts, Plaintiff has raised a dispute of fact as to the ERISA claim, even under an abuse of discretion standard. It is undisputed that Ms. Burgard had a life insurance plan; that the type of life insurance plan she had could have been carried over through the mergers and provided a benefit upon her death, and that Defendants have no records as to coverage or lack thereof from 1992 through 2001. While Defendants have presented a plausible explanation for the lack of records, they have not definitively demonstrated that Burgard waived or abandoned her life insurance benefit, and there is no direct evidence of any waiver or abandonment. Therefore, the Court will deny summary judgment as to the ERISA claim. This denial is not a final ruling on "a bench trial on the record." See Thomas v. Oregon Fruit Products Co., 228 F.3d 991, 996 (9th Cir. 2000).

Recognizing the unusual nature of this case, the Court has requested supplementary briefing as the standard of review, the scope of evidence it may consider, the type of trial available, and the possibility of amendment. The Court need not yet decide these issues in this Order.

### VII.    MOTION TO RECONSIDER. ECF NO. 53.

On August 4, 2016, Defendants filed a Motion for a Protective order. ECF No. 39. The Motion sought to limit deposition testimony of various individuals allegedly possessing knowledge as to Burgard's life insurance policy. On September 9, 2016, Judge Foley granted the motion in part and denied in part He determined that "Defendants' motion for summary judgment appears to make a strong case that the "safe harbor" exception does not apply; that Plaintiff's claim for life insurance benefits is governed by ERISA and that the state law claims are preempted." Relying in part on the determination that ERISA likely governed, and caselaw on the need to balance the goals of ERISA, including maintaining premium costs at a reasonable level, with the goals of obtaining justice in litigation in setting the scope of discovery (ECF No. 50 at 7-8), he ordered one 30(b)(6) deposition of a representative of BANA who "should be prepared to testify about relevant information or documents in the possession of both BANA and Aetna." The testimony was to cover (1) "the fate of the life insurance policy provided to Ms. Burgard at the time of her retirement in 1986, (2) what records may exist pertaining to cancellation of life

insurance policies provided to retired employees by predecessor employers or plans; (3) the process by which retired employees were able to convert to life insurance policies in which they pay premiums; and (4) what records may still exist regarding the termination of Burgard's plan and if she was afforded an opportunity to continue life insurance coverage."

Plaintiff objects to the limitations in deposition testimony, specifically that it was not permitted to depose certain individuals.  First, Plaintiff sought to depose Stephanie Skowron, the Aetna Senior Life Claims analyst whose declarations states that she was responsible for the handling of Burgard's Accidental Death (AD) and Personal Loss (PL) claim and reviewed her administrative record. Her declaration states that "at no time did the system identify life insurance benefits for Marilyn Burgard, and I am not aware for any documentation from Aetna or Bank of America recording that Marilyn Burgard had life insurance under the terms of the Plan." Plaintiff also sought and seeks to depose "Jasmine," the author of an August 27, 2012 letter, on Bank of America letterhead, stating that "Marilyn is covered under the Retiree Life Insurance Plan." Defendants in their Reply to the MSJ argue that she was referring generally to the portion of the Plan that included the undisputed accidental death coverage. Plaintiff contends that Defendants can't rely on this declaration to claim there is no life insurance policy while avoiding deposition. Third Plaintiff sought to depose a 30(b)(6) representative of Aetna. Plaintiff states that Defendants mailed a disk with 400 pages of previously undisclosed documents to Plaintiff on August 18, received August 22, a day before the close of discovery.

Plaintiff posits the following errors in Judge Foley's reasoning: (1) The Magistrate erroneously considered facts and arguments in ECF 47 MSJ even though the Response had not yet been filed. (2) The order failed to acknowledge the Plaintiff's attempted communications with defendants regarding the depositions. (3) The magistrate erroneously determined that ERISA likely applied and therefore erroneously applied ERISA standards to discovery. (4) The magistrate erroneously denied the above-listed depositions. Plaintiff argues that the depositions are proportional to the needs of the case, and should have been and should be permitted.

Plaintiff argues that defendants' initial disclosures failed to list any witnesses and that providing 400 pages of discovery and witness disclosure just before the deadline prejudiced

Plaintiff. Defendants argue that judge Foley properly considered the standard, including discovery limitations in ERISA cases, and properly limited discovery to the one 30(b)(6) rep of BANA, the plan administrator, which he determined would be in a better position to identify records, "if any exist, regarding the fate of the life insurance policy issued to Burgard at the time of her retirement." Defendant argues that its disclosures were within the order deadlines, and that it has not disclosed any documents regarding the original life insurance policy because the policy was likely terminated by Ms. Burgard and converted to an individual policy prior to BANA's acquisition of Security Pacific. Therefore, neither defendant would have the original policy in its records. At the hearing on March 17, 2017, the Defendants identified "Jasmine" as an employee of AON Hewett, one of the former insurance claims administrators for Bank of America.

The Court finds that Judge Foley did not err in the limiting the discovery. His order properly limited discovery in light of the likelihood that ERISA applied, while not unduly preventing Plaintiff from seeking information that might establish the safe harbor or otherwise counter the ERISA arguments, and that might elucidate the "fate" of any insurance plan for which defendants would be liable.

The Aetna handler at the time of Ms. Burgard's death, Ms. Skowron, stated in her declaration that "at no time did the system identify life insurance benefits for Marilyn Burgard, and I am not aware for any documentation from Aetna or Bank of America recording that Marilyn Burgard had life insurance under the terms of the Plan." Based on this statement and on his finding that BANA, as the plan administrator, would have any documents or knowledge of the original plan and the transfer of plans after the acquisitions, Judge Foley properly limited the testimony to the BANA 30(b)(6) representative, who ultimately did provide testimony as to the original coverage and how it subsequently changed after the acquisitions.

It is undisputed that Aetna did not become the claims administrator until January 1, 2009, that Defendants have records for Ms. Burgard beginning in 2001, and that those records never indicate coverage for the disputed life insurance. Plaintiff has not persuasively argued that deposing Skowron or another Aetna representative, or "Jasmine," who worked for a third-party that contracted with Bank of America, and would not have superior access to information regarding

any plan, would provide needed information as to either ERISA preemption or the "fate" of the disputed policy since Ms. Burgard's retirement. Therefore, the Motion to Reconsider, ECF No. 53, is DENIED.

## VIII.   CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that ECF No. 47 Motion for Summary Judgment is granted in part and denied in part. The state law claims are dismissed as pre-empted by ERISA. Count IV for violation of ERISA may proceed.

**IT IS FURTHER ORDERED** that a hearing on ECF Nos. 84 and 85 Supplemental Briefs is set for  Thursday, April 20, 2017 at 10:00 AM in LV Courtroom 7D.

**IT IS FURTHER ORDERED** that ECF No. 62 Motion for Leave to File Supplement is GRANTED.

**IT IS FURTHER ORDERED** that ECF No. 53 Motion to Reconsider is DENIED.

**DATED:** <u>March 31, 2017</u>.

_____
**RICHARD F. BOULWARE, II**
**UNITED STATES DISTRICT JUDGE**